JOURNAL ENTRY AND OPINION
{¶ 1} Appellant Anita Iglodi, as the executrix of the estate of decedent Lora Iglodi,[1] appeals from a jury verdict in favor of defendants-appellees Edgar Tolentino, M.D. and Kuldeep Singh, M.D., on Iglodi's medical malpractice claims. Although both defendants were surgeons who treated Iglodi for gastrointestinal conditions, Iglodi claimed that they also treated her as primary care physicians and should have advised her to obtain a baseline mammogram on her 40th birthday. She further claimed that their subsequent failure to timely diagnose and treat her breast cancer proximately caused her damages. In this appeal, she argues that the court erred by (1) prohibiting her expert from testifying as to the standard of care, (2) refusing to remove for cause a juror who had a previous adversarial relationship with plaintiff's counsel, (3) permitting both defendants to testify to the high rates of medical malpractice insurance, and (4) permitting a defense expert to cite to and testify from a medical study as substantive evidence. We find no merit to any of these arguments and affirm.
 {¶ 2} None of the assigned errors challenge the weight or sufficiency of the evidence. We state the facts in summary form. Iglodi suffered from Crohn's Disease, a chronic gastrointestinal condition that sometimes caused her to suffer severe intestinal pain. Both Singh and Tolentino were surgeons who treated Iglodi for symptoms relating to her Crohn's Disease. Iglodi first met Singh in 1991, during an emergency room visit to Deaconess Hospital. Singh, the attending emergency room physician, treated and released her. He conducted a follow-up examination two months later, and over the course of 12 years, treated her both in the emergency room and at his office until he closed his practice in January 2003.
 {¶ 3} Iglodi alleged that Singh acted as her primary care physician during this time and thus had a duty to ensure that she obtained a baseline mammogram on her 40th birthday. Singh repeatedly denied acting as a primary care physician, and insisted that he treated Iglodi only for Crohn's Disease or conditions that were ancillary to Crohn's Disease. With respect to Iglodi's gynecological care, Singh testified that Iglodi told him that she had been using Planned Parenthood for such care.
 {¶ 4} Although Iglodi claimed to have used Planned Parenthood solely for birth control, she acknowledged that during her yearly visits there, she would receive a PAP test and breast exam. The evidence showed a carbon receipt from a prescription slip written in August 2002 in which Planned Parenthood prescribed Iglodi a mammogram. Iglodi denied receiving the prescription slip, but did recall discussing the need for a mammogram at that time.
 {¶ 5} In November 2002, Iglodi went to the emergency room at Deaconess Hospital complaining of abdominal pain. She was admitted into the care of Tolentino, who performed an upper GI endoscopy. At this point, Iglodi considered Tolentino to be her primary care physician. Tolentino gave conflicting testimony on his relationship with Iglodi: he testified on the one hand that he considered himself primarily a general surgeon and told Iglodi to follow up with her primary care physician. On the other hand, he testified that he sometimes took on patients as a primary care physician, and that he considered Iglodi to be a primary care patient.
 {¶ 6} In December 2002, Iglodi first noticed a lump in her right breast. She said that she notified Planned Parenthood of the lump in February. On February 17, 2003, Iglodi again went to the emergency room complaining of abdominal pain, vomiting and diarrhea. At this time, she told Tolentino about the lump. Tolentino wanted to perform a mammogram but the mammogram machine at the hospital had been out of service. Iglodi denied having any knowledge that the mammogram machine had been out of service and said that Tolentino told her that a biopsy would be better than a mammogram.
 {¶ 7} Tolentino performed a lumpectomy on February 21, 2003. He removed a small tumor and the pathology report showed the tumor to be benign. Tolentino said that the presence of the tumor indicated to him that a mammogram should be administered, but that Iglodi's incision would need time to heal before a mammogram could be performed on her. His notes indicate that he saw Iglodi in his office on May 16, 2003, by which time the incision had healed. Iglodi claimed that she was not told to have a mammogram. Tolentino testified that his office notes indicate "will do mammogram per screening." He said that he assumed his staff would write a prescription for a mammogram, but his office notes did not show that any prescription had been written. Treatment notes from a Cleveland Clinic doctor who was asked for an opinion relating to the management of her cancer tended to substantiate Tolentino's testimony. In the "history of present illness" section of a clinical note dated August 12, 2003, the doctor wrote, "she was told to have a mammogram; however, this was deferred due to intermittent hospitalizations for her Crohn disease attacks."
 {¶ 8} Over the next few months following the lumpectomy, Iglodi experienced pain from her back that radiated to the front, right side of her body. The pain did not go away, and she twice went to the emergency room and saw a pulmonary doctor (Iglodi had, by this time, developed pleurisy, an inflammation of the lining of the pleural cavity surrounding the lungs). She was referred to the Cleveland Clinic. In the course of draining fluid from her lungs, doctors discovered abnormal cells which indicated the presence of cancer. After a CT scan and other tests were performed, doctors discovered Iglodi had stage IV cancer that had metastasized to the lining of her right lung, her left shoulder and ribs.
 I {¶ 9} The estate's first assignment of error argues that the court erred by prohibiting Iglodi's expert, Barry Singer, M.D., board certified in internal medicine, hematology and oncology, from testifying that Tolentino's actions fell below the relevant standard of care in two respects: (1) by failing to conduct a complete physical and obtain a mammogram in November 2002 and (2) failing to obtain a mammogram before performing the lumpectomy in February 2003. Tolentino objected to Singer's testimony because Singer was not a surgeon and could not testify to the relevant standard of care relating to Tolentino's actions as a surgeon. The court conducted an extensive voir dire of Singer and concluded that Singer could testify to a family practice standard of care used by a specialist but that he could not testify to a surgeon's standard of care or as to a decision to operate without a mammogram.
 1 {¶ 10} To prove her medical malpractice claim, Iglodi had to show by a preponderance of the evidence that she suffered an injury due to Tolentino's failure to conduct a full physical examination, including a mammogram, and his failure to obtain a mammogram prior to performing the lumpectomy. Iglodi also had to show that these failures in treatment fell below the recognized standards of medical care in the community.Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 131-132. Standards of the medical community are not common knowledge, so Iglodi had to prove causation through expert medical testimony. Shumaker v. Oliver B. Cannon Sons, Inc. (1986), 28 Ohio St.3d 367. To qualify as an expert, Singer needed to possess "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony[.]" See Evid.R. 702(B).
 {¶ 11} The law does not require an expert witness to practice in the same speciality as the defendant physician. Alexanders. Mt. Carmel Med.Ctr. (1978), 56 Ohio St.2d 155, 158. The expert need only demonstrate a familiarity with the standard of care applicable to the defendant that is "sufficient to enable [the expert] to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school and, or, specialty if it differs from that of the defendant." Id. at 160. Nevertheless, because an expert opinion must be grounded on "specialized" knowledge and experience, an expert's background within a specific discipline will often be determinative of the question of expertise. See, e.g.,McKinney v. Schlatter (1997), 118 Ohio App.3d 328 (cardiovascular thoracic surgeon not qualified to testify as to standard of care of a cardiologist or emergency room physician); Nichols v. Hanzel (1996),110 Ohio App.3d 591 (internist/dermatologist not qualified to testify as to the standard of care of an orthopedist pertaining to the cause of osteonecrosis); Hudson v. Arias (1995), 106 Ohio App.3d 724
(gastroenterologist not qualified to testify as to the standard of care of a gynecologist regarding the failure to diagnose a precancerous lesion of the colon). At all events, the court has the discretion to determine the admissibility of expert testimony, Evid.R. 104(A), and we will not disturb such decisions absent abuse of discretion. Miller v.Bike Athletic Co. (1998), 80 Ohio St.3d 607, 616, 1998-Ohio-178.
 2 {¶ 12} The court did not abuse its discretion by finding Singer unqualified to state the relevant standard of care for a surgeon, treating a 40-year-old patient who received gynecological care elsewhere. Singer was neither a surgeon nor a primary care physician. He testified at voir dire that since 1988, he has devoted 75 percent of his practice to oncology and 25 percent of his practice to hematology. He conceded that he had never been a surgeon and could not testify to the standard of care required of a surgeon. Singer said that he would occasionally do the work of a primary care physician for his cancer patients; for example, writing prescriptions for miscellaneous needs the patient might have during an office visit. But he emphasized that "I'm not a primary care physician. I'm a specialist."
 {¶ 13} The estate argues without any support that the court abused its discretion by forbidding Singer from testifying to the standard of care because "[t]he necessity of obtaining a diagnostic mammogram before operating on a palpable breast mass is well known to doctors who practice oncology, general internal medicine, obstetrics and gynecology, surgeons and others."
 {¶ 14} In some cases, fields of expertise overlap to an extent that an expert in one field may be allowed to testify to standards of care in an overlapping field. Alexander, 56 Ohio St.2d at 159. In Reed v.MetroHealth Med. Ctr. (Apr. 11, 2002), Cuyahoga App. No. 80044, we held that a doctor had been qualified to render an opinion as to the standard of care regarding the placement of an IV line. The doctor testified that the placement of an IV was a procedure that could be performed by several different medical professionals, including physicians, nurses, and other medical professionals who undertook specialized training in IV therapy. The doctor testified that he had placed IV lines several times; thus, he was qualified to render an opinion on the subject.
 {¶ 15} This case is distinguishable from Reed because Singer did not testify that he engaged in primary care or surgery. He conceded that he could not render opinions as to either surgeons or primary care physicians. Although his voir dire testimony stated that he believed a primary care physician should ensure that a patient received gynecological care, including ordering a mammogram, he conceded in deposition that a primary care physician would not have to order a baseline mammogram if the patient was following up with a gynecologist, as Iglodi had done with Planned Parenthood. These concessions were significant enough that the court, in the exercise of its discretion, could conclude that Singer lacked the expertise to render opinions on the relevant standard of care for surgeons like Tolentino.
 II {¶ 16} The estate's second assignment of error raises similar arguments relating to the court's decision to bar Singer from testifying to the standard of care for Singh. The estate maintains that Singer could competently testify to Singh's standard of care based on Singer's education, training and certification in internal medicine, and his familiarity with surgeons.
 {¶ 17} We reincorporate our discussion in Part I of this opinion and conclude that the court did not abuse its discretion by barring Singer's testimony relative to Singh's standard of care. Singer was neither a surgeon nor a primary care physician. While he may have had exposure to both disciplines during his career, he candidly agreed to a lack of competence in either field. That being the case, the court could rationally conclude that Singer's association with physicians in these related disciplines was insufficiently equivalent to justify his giving expert testimony relating to the applicable standard of care. This conclusion would be entirely rational and therefore not an abuse of the court's discretion under Miller v. Bike Athletic Co.
 III {¶ 18} In its third assignment of error, the estate complains that the court abused its discretion during jury voir dire by refusing to remove for cause Juror 13. Iglodi's counsel believed she (Juror 13) had a previous adversarial relationship with the estate's counsel. The estate maintains that the court's failure to remove the juror forced Iglodi to use a peremptory challenge to remove the juror from the venire.
 {¶ 19} R.C. 2313.42 sets forth various grounds for challenging for cause a person otherwise qualified to serve as a petit juror. R.C.2313.42(J) states that a petit juror may be excluded for cause if the juror discloses that the juror "cannot be a fair and impartial juror."
 {¶ 20} R.C. 2313.43 states that any petit juror may be "challenged on suspicion of prejudice against or partiality for either party * * *. The validity of such challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased." In Berk v. Matthews (1990), 53 Ohio St.3d 161, the syllabus states:
 {¶ 21} "The determination of whether a prospective juror should be disqualified for cause pursuant to R.C. 2313.42(J) is a discretionary function of the trial court. Such determination will not be reversed on appeal absent an abuse of discretion. Maddex v. Columber [1926], 114 Ohio St. 178, 151 N.E. 56, approved and followed.)" The supreme court emphasized that "when applying this standard, an appellate court is not free to substitute its judgment for that of the trial judge." Id. at 169.
 {¶ 22} Counsel told the court that his firm had represented a local school district in a contentious strike and believed that Juror 13 had been involved in organizing the strike or organizing picketing during the strike. Counsel also told the court that some of the picketers had picketed his firm's offices during the strike. He feared that his identity might come to Juror 13's attention during the trial and that "there may be animosity towards us." At the start of voir dire, Juror 13 told the court that she did not recognize counsel. When the court interviewed Juror 13 in chambers, she stated that she had been involved in picketing during the strike, but remained adamant that she had never seen counsel before. Counsel apparently had no independent recollection of the juror or whether she had picketed his office. He told the court that his office was unable to verify whether Juror 13 had picketed at his firm's offices. He told the court that "I can't dispute it [the juror's picketing] at this point. * * * Now, if we had it, her name came up in this, then there may be [proof of her hostility]."
 {¶ 23} Counsel also believed that his firm had defended against a workers' compensation claim filed by the juror. Juror 13 admitted filing a workers' compensation claim, but again said that she had never met counsel.
 {¶ 24} Iglodi used a peremptory challenge to remove the juror from the venire.
 1 {¶ 25} Singh and Tolentino argue that the estate has waived the right to challenge on appeal the court's failure to remove Juror 13 for cause because Iglodi did not exhaust all of her peremptory challenges. SeeState v. Getsy, 84 Ohio St.3d 180,191, 1998-Ohio-533.
 {¶ 26} The record shows that Iglodi and both defendants exercised a first peremptory challenge. Iglodi then passed, and the defendants exercised their second peremptory challenge. Iglodi then removed Juror 13.
 {¶ 27} Civ.R. 47(C) states in part, "[peremptory challenges shall be exercised alternately, with the first challenge exercised by the plaintiff. The failure of a party to exercise a peremptory challenge constitutes a waiver of that challenge, but does not constitute a waiver of any subsequent challenge."
 {¶ 28} The Staff Notes to Civ.R. 47(C) describe the operation of this part of the rule:
 {¶ 29} "Thus, assume that plaintiff waives [plaintiff's] first opportunity to exercise a peremptory challenge. Defendant exercises [defendant's] first peremptory challenge. If plaintiff, in turn, now exercises a peremptory challenge, the challenge will be [plaintiff's] second challenge because [plaintiff] has waived [plaintiff's] first challenge."
 {¶ 30} Because Iglodi passed on her second round peremptory challenge, her third round peremptory challenge to Juror 13 meant that she had exhausted all of her peremptory challenges, contrary to appellee's belief.
 2 {¶ 31} Even though the estate has standing to argue that the court abused its discretion by failing to remove Juror 13 for cause, we conclude that the court did not abuse its discretion by denying the challenge for cause because Iglodi failed to prove to the court that Juror 13 would be partial. Prior to her in-chambers voir dire, Juror 13 stated her determination to "make a fair decision for both sides here." The in-chambers voir dire showed only that Juror 13 recognized the name of counsel's law firm from the strike — she firmly denied knowing counsel. Nothing presented to the court would permit it to conclude that the juror exhibited any bias or could not remain impartial.
 IV {¶ 32} In its fourth assignment of error, the estate complains about two instances where the jury heard testimony referencing the high cost of malpractice insurance. The estate maintains that these statements were barred under Evid.R. 411 because the issue of malpractice insurance premiums have become a "hot-button issue" in this state and the mere mention of them can serve no purpose other than to arouse the passion and prejudice of the jury in sympathy for medical doctors.
 1 {¶ 33} Evid.R. 411 states:
 {¶ 34} "Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership or control, if controverted, or bias or prejudice of a witness."
 {¶ 35} Evid.R. 411 is patterned after Fed.R.Evid. 411. The advisory committee's commentary to Fed.R.Evid. 411 states:
 {¶ 36} "The courts have with substantial unanimity rejected evidence of liability insurance for the purpose of proving fault, and absence of liability insurance as proof of lack of fault. At best the inference of fault from the fact of insurance coverage is a tenuous one, as is its converse. More important, no doubt, has been the feeling that knowledge of the presence or absence of liability insurance would induce juries to decide cases on improper grounds."
 {¶ 37} Interestingly, medical doctors had previously sought to keep proof of insurance from jurors for fear that juries would adopt a "deep pockets" view of cases and penalize defendants. Here, the estate contends that medical doctors now wish to mention malpractice insurance; specifically, the high cost of premiums, to show that frivolous lawsuits are driving doctors from practice.
 {¶ 38} Evid.R. 411 bars the introduction of liability insurance as proof that the insured party acted negligently or otherwise wrongfully. Iglodi did not introduce evidence of medical malpractice insurance, so the rule does not apply. The estate's argument would be better grounded under Evid.R. 403(A), which requires the mandatory exclusion of relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." We need not consider the application of this evidentiary rule, however, because Iglodi waived the error by failing to object and the court cured any possible error.
 2 {¶ 39} The first claimed violation by the estate occurred during Tolentino's direct examination. When giving his family background, he mentioned that he had a son who became a doctor. The son "wanted to serve and practice here in Cuyahoga, but because of the offer by U.S. and Metro and University of Cincinnati, he had to decline them because of very high malpractice premium [sic]. And he's now in his own practice." Iglodi did not object to this statement.
 {¶ 40} The failure to object to possible error results in a waiver of the issue on appeal. Goldfuss v. Davidson (1997), 79 Ohio St.3d 116,121, 1997-Ohio-401. While the plain error doctrine does apply in civil cases, it is not favored and "may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Id. at syllabus.
 {¶ 41} Iglodi's failure to object to this statement at trial waived any error other than plain error. We do not find that this fleeting mention of the high cost of medical malpractice insurance constitutes the "extremely rare case" which so seriously undermines the basic fairness or integrity of the trial that reversal is mandated.
 3 {¶ 42} The estate next complains that during Singh's direct examination, he detailed his employment history, telling the jury that he practiced medicine "until 2003, the exact date is January 15, and the time [sic] there was the insurance, medical malpractices [sic] insurance, amounted of [sic] too high —." Iglodi objected and the court held an off-the-record sidebar discussion. When the court went back on the record, Iglodi's counsel stated, "I just want to make sure that objection is on the record." The court confirmed that the objection had been noted and asked counsel "do you want to make a motion?" Counsel replied negatively, and the court stated, "ask a new question and the last statement will be stricken from the record."
 {¶ 43} In its instructions to the jury, the court stated that "statements ordered to be stricken or to which the court sustained an objection * * * are not evidence and must be treated as though you never heard them." By sustaining Iglodi's objection and ordering Singh's statement stricken from the record, the court effectively told the jury that it could not consider the statement as evidence. A jury is presumed to follow the court's cautionary instructions. See Behinger v. Mt. SinaiMed. Ctr. (1990), 68 Ohio App.3d 830, 841. The estate offers nothing to rebut this presumption, so we find no error.
 V {¶ 44} For its fifth assignment of error, the estate complains that one of Tolentino's experts, Arnold Baskies, M.D., improperly cited a study from the National Surgical Adjuvant Breast Project ("NSABP") on direct examination and quoted from that study in order to introduce substantive evidence. The cited study concluded that breast cancer patients who had their cancer diagnosed within zero to three months after discovering a lump had no greater survival rate than those patients who were not diagnosed for more than one year after discovery of a lump. The estate argues that Baskies' testimony consisted of impermissible hearsay.
 {¶ 45} None of Baskies' testimony constituted hearsay. Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion." Evid.R. 801(A). Baskies did not quote from any portion of the study, so he did not relate any oral or written assertion. In fact, Baskies characterized himself as a "co-investigator" on the study, so his summarization of the study's findings would be first-hand and thus outside of the hearsay rule.
 {¶ 46} We believe that the court properly admitted Baskies' testimony under Evid.R. 703, which permits the facts or data which underlie an expert opinion to be admitted into evidence. In Smith v. Daneshjoo, Montgomery App. Nos. 18802 and 19088, 2002-Ohio-4338, the Second District Court of Appeals considered this precise issue. One of Smith's experts, like Baskies, had been a "principal" investigator on the NSABP study and testified to findings reached in that study. The Second District rejected the assertion that the witness had improperly used the results of a study as substantive evidence, instead stating:
 {¶ 47} "Reed had clearly relied on the NSABP studies in forming his own opinions, but he had also been actively involved in those studies and did not offer the results of those studies as substantive evidence independent of his opinion.
 {¶ 48} "Reed's testimony was more akin to the expert testimony offered in Wightman v. Consolidated Rail Corp., 86 Ohio St.3d 431,1999-Ohio-119, wherein the expert testified about `broad patterns' that had been observed in collisions at railroad crossings. InWightman, the supreme court held that `there are certain things that an expert, by reason of his expertise, knows. * * * When providing background information, and not opining as to causation, we cannot expect an expert to footnote every statement with a recitation of his direct observation of the phenomenon, or a bibliography explaining how he knows his statement to be true. * * * A distinction can be made between background information and an opinion about causation. * * * When testifying as to broad patterns rather than specific opinions, the same level of foundation is not required.' Id. at 437-438. See, also, State v. Jenkins, Miami App. No. 2000-CA-59, 2002-Ohio-3651 (holding that expert testimony that physical evidence of child sexual abuse was present in only 15 percent of cases assisted the jury in determining whether abuse had occurred and did not run afoul of Evid.R. 703). In our view, Reed's testimony about the likelihood that Smith's cancer had spread to her lymph nodes in March 1995, which incorporated his involvement with the NSABP studies and the data gathered from those studies, did not violate Evid.R. 703 by incorporating hearsay testimony." Id. at TJ21-22.
 {¶ 49} Singh and Tolentino called Baskies to render an opinion as to whether the alleged delay in diagnosing Iglodi's breast cancer had caused her injury. Baskies held the opinion that Iglodi's breast cancer had become metastatic (that is, had spread from her breast to other parts of her body) by November 2002. He also held the opinion that the Level IV "staging" of her breast cancer (its severity) had not changed from November 2002 to the time of her diagnosis in July 2003.
 {¶ 50} Baskies cited the 1978 NSABP study in response to the question of why a patient whose mammogram shows a breast mass might have to wait for up to six months before having a follow-up mammogram taken. He said that the six-month figure was recognized by the American College of Radiology and had not been arbitrarily chosen. The NSABP study found that the survival rate for patients who waited up to six months for follow-up mammographies did not change from those who received immediate follow-ups. Baskies said that this happened because breast cancer could take seven years to grow to the size of a pea — a wait of six more months would have no appreciable effect on reducing the potential harm to the patient. Baskies also noted that new research suggests that a patient could be genetically predisposed to cancer mortality. Hence, he concluded that "what happens in breast cancer isn't determined by how long you wait to get your diagnosis, it's what happened here [apparently indicating] before you know you have it."
 {¶ 51} The court has broad discretion in admitting evidence at trial.State v. Sage (1987), 31 Ohio St.3d 173. Baskies' reference to the NSABP study, among other things, showed the jury what facts he relied upon when reaching his opinion regarding the standard of care for the defendants and whether the defendants violated that standard of care. Because these were proper references, the court did not abuse its discretion by permitting Baskies' testimony.
 VI {¶ 52} Tolentino has filed a cross-appeal in which he maintains that the court erred by refusing to direct a verdict in his favor. He argues that the court's decision to preclude Singer from testifying to the relevant standard of care meant that Iglodi failed to provide any evidence that Tolentino had been negligent.
 {¶ 53} App.R. 12(A)(1)(c) states that the court of appeals may disregard an assignment of error if it is made moot by the resolution of another assignment of error. By overruling each of the estate's assignments of error, we have affirmed the jury verdict. A consideration of Tolentino's cross-assignment of error could afford him no further relief. Accordingly, the issue relating to the directed verdict is moot. See Soltis v. Wegman, Hessler, Vanderburg O'Toole (Feb. 13, 1997), Cuyahoga App. No. 69602.
Judgment affirmed.
It is ordered that defendants-appellees/cross-appellants recover of plaintiff-appellant/cross-appellee their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, P.J., and ANN DYKE, J., CONCUR
[1] Lora Iglodi died in September 2006, after she filed her merit brief in this appeal. On March 14, 2007, we permitted Anita Iglodi to substitute as a party pursuant to App.R. 29(A). For convenience, we will use the name "Iglodi"to refer to Lora Iglodi and the name "estate" to refer to Anita Iglodi, as executrix of the estate and current party in interest.