OPINION
{¶ 1} John J. Scaccia and his former wife, Cynthia Scaccia (collectively, "the Scaccias"), appeal from a judgment of the Montgomery County Court of Common Pleas, which granted summary judgment to Dayton Newspapers, Inc. and a number of its employees *Page 2 
(collectively, "DNI") on the Scaccias' defamation claim. The Scaccias' claim was based on five articles — four news articles and one opinion article — published by the Dayton Daily News in 1998 regarding the Scaccias' involvement with Charles Hoffman, an elderly neighbor who had given the Scaccias more than $500,000 in money and gifts between 1995 and 1998.
 {¶ 2} This is the third appeal arising out the litigation between the Scaccias and DNI. In the first appeal, we reversed the trial court's order disqualifying the Scaccias' attorney from representing them.Scaccia v. Dayton Newspapers, Inc., Montgomery App. Nos. 18435 and 18729, 2001-Ohio-1834 ("Scaccia I"). In the second appeal, we concluded that the trial court abused its discretion when it granted DNI's motion for summary judgment on the record before it, when the Scaccias had filed a motion to compel discovery but had not received discovery. We affirmed the trial court's determination that John Scaccia, who at the time of the articles was chief of the criminal section of the City of Dayton's Law Department, was a public figure for purposes of his defamation claim, but we found that the trial court had erred when it determined that Cynthia Scaccia was a limited public figure for purposes of her defamation claim. We remanded for further proceedings.Scaccia v. Dayton Newspapers, Inc., 170 Ohio App.3d 471, 2007-Ohio-869,867 N.E.2d 874 ("Scaccia II").
 {¶ 3} Upon remand, the trial court again granted summary judgment to DNI, this time concluding that the articles were substantially true. The court reached its conclusion by comparing the newspaper articles with the probate record concerning a petition by Montgomery County Department of Human Services, Adult Protective Services ("APS"), for authority to provide protective services for Mr. Hoffman. The court did not consider the affidavits of the Scaccias' experts. *Page 3 
 {¶ 4} The Scaccias appeal the grant of summary judgment and the trial court's failure to consider their experts' affidavits. For the following reasons, the trial court's judgment will be AFFIRMED.
 I {¶ 5} Civ. R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. See State ex rel. Grady v. State Emp.Relations Bd, 78 Ohio St.3d 181, 183, 1997-Ohio-221, 677 N.E.2d 343;Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 65-66,375 N.E.2d 46. Our review of the trial court's decision to grant summary judgment is de novo. See Helton v. Scioto Cty. Bd. of Commrs. (1997),123 Ohio App.3d 158, 162, 703 N.E.2d 841.
 {¶ 6} To prevail on a claim of defamation, the evidence must establish (1) a false and defamatory statement concerning the plaintiff; (2) publication of the statement; (3) fault; and (4) harm. Wilson v.Wilson, Montgomery App. No. 21443, 2007-Ohio-178, ¶ 12; see Jackson v.Columbus, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9. Harm includes damage to the person's reputation; exposing the person to public hatred, contempt, ridicule, shame or disgrace; or adverse affects to the person's trade, business, or profession. Jackson at ¶ 9.
 {¶ 7} The degree of fault that is required depends on the status of the person allegedly defamed. Where the plaintiff is a private individual, such as Cynthia Scaccia, the court must apply a negligence standard. The plaintiff must demonstrate that "the published statement or *Page 4 
statements are defamatory because they are objectively false and that the defendant acted unreasonably in attempting to discover the truth or falsity of the publication's defamatory character." Scaccia II at ¶ 38. The plaintiff must prove negligence by clear and convincing evidence. Id.
 {¶ 8} When the plaintiff is a public figure, such as John Scaccia, the public official may not recover for defamatory statements unless he can establish that publisher acted with actual malice. "Actual malice" is defined as "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." New York Times v.Sullivan (1964), 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686; see, also, Jackson at ¶ 10. "The phrase `reckless disregard' applies when a publisher of defamatory statements acts with a `high degree of awareness of their probable falsity,' or when the publisher `in fact entertained serious doubts as to the truth of his publication.'" Jackson at ¶ 10, quoting Garrison v. Louisiana (1964), 379 U.S. 64, 85 S.Ct. 209,13 L.Ed.2d 125, and St. Amant v. Thompson (1968), 390 U.S. 727, 731,88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267.
 {¶ 9} Regardless of the status of the plaintiff, it is well-established that truth is a defense to a defamation claim. R.C. 2739.02. See, also, e.g., Krems v. University Hosp. of Cleveland (1999),133 Ohio App.3d 6, 12, 726 N.E.2d 1016. "It is sufficient to show that the imputation is substantially true, or as it is often put, to justify the `gist,' the `sting,' or the `substantial truth' of the defamation." W. Prosser, Law of Torts (4 Ed. 1971), 798-799; National Medic ServicesCorp. v. E.W. Scripps Co. (1989), 61 Ohio App.3d 752, 755,573 N.E.2d 1148.
 {¶ 10} As we stated in Scaccia II, "[n]ewspapers are privileged to print fair, accurate, and impartial reports of judicial proceedings, unless the newspaper is shown to have acted *Page 5 
maliciously. R.C. 2317.05. `In order to invoke this privilege, the report need not be a verbatim account of the official record. Instead, the report need only be a substantially accurate account. A "substantially accurate report" is one that conveys the essence of the official record to the ordinary reader, without misleading the reader through the inclusion of inaccurate information that is not in the record or through the exclusion of relevant evidence that is in the record.'" (Citations omitted) Scaccia II at ¶ 39.
 {¶ 11} In this case, the trial court determined that DNI had demonstrated that most of the statements in the articles were objectively true, that the articles were substantially true, and that some statements were privileged opinion. As stated above, the court made these determinations without considering affidavits from the Scaccias' two experts.
 II {¶ 12} The Scaccias raise two assignments of error on appeal, which we will address in reverse order. The second assignment of error states:
 {¶ 13} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN NOT CONSIDERING APPELLANTS' EXPERT AFFIDAVITS."
 {¶ 14} In their second assignment of error, the Scaccias claim that the trial court erred in not considering the affidavits of their experts, Jeff Epton and Joseph Goulden.
 {¶ 15} Under Evid. R. 702, a witness may testify as an expert when "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; [and] (C) The witness' testimony is based on reliable scientific, *Page 6 
technical, or other specialized information." "[T]he test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth." Ishler v. Miller
(1978), 56 Ohio St.2d 447, 453, 384 N.E.2d 296.
 {¶ 16} "A trial court has the discretion to determine the admissibility of expert testimony, and an appellate court will not disturb such decisions in the absence of an abuse of that discretion.Iglodi v. Tolentino, Cuyahoga App. No. 88264, 2007-Ohio-1982, ¶ 12. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219." Anousheh v.Planet Ford, Inc., Montgomery App. Nos. 21960 21967, 2007-Ohio-4543, ¶ 69.
 {¶ 17} The Scaccias offered the affidavits of two proposed experts. Epton was a political activist, writer, and media critic, who was also the co-publisher and political writer for Impact Weekly (formerly, theDayton Voice), an alternative weekly newspaper in Dayton. Epton reviewed DNI's Scaccia articles, concluding that the September 20, 1998 and October 26, 1998 stories did not accurately reflect the relationship between the Scaccias and Hoffman and gave the incorrect impression that the Scaccias had done something wrong. Epton characterized the articles as containing misrepresentations, omissions, errors, and distortions of the truth. Epton stated that, "had the News chosen to do a story that reflected the entirety of the materials at hand, they would have written about the warm and caring relationship that developed between one elderly man, without heirs, and the entire family that loved and cared for him." Epton also stated that Hap Cawood's opinion article in December 1998 allowed Cawood "to renew the attack on the Scaccias * * * and [to] contrive a concern about Judge Gounaris' rulings, which *Page 7 
represented an implicit challenge to any characterization of the Scaccias' activities as exploitive or worse." Epton indicated that the Dayton Voice did not run any articles about the Scaccias and Hoffman.
 {¶ 18} Joseph Goulden's affidavit indicated that he had previously qualified as an expert witness on the conduct of the media in several other cases. Upon review of articles and the Scaccias' complaint, Goulden opined that "the DDN [Dayton Daily News] violated generally accepted standards of journalistic fairness in its portrayal of the relationship between Mr. Scaccia and his wife and Mr. H, and gave a grossly unfair and apparently deliberately inaccurate account of the court proceeding concerning this relationship." After discussing portions of the transcripts from the probate proceeding that demonstrated the level of care given to Hoffman by Cynthia Scaccia and Hoffman's intent to give money to the Scaccias, Goulden noted that the DDN news staff "seemingly rejected the notion that what happened between Mr. H and the Scaccia family represented human decency at its best. By ignoring this crucial aspect of the story, in my opinion, the DDN displayed a reckless disregard for the truth."
 {¶ 19} In determining that he need not consider Epton's and Goulden's affidavits, the trial court indicated that expert testimony was not necessary to determine whether the articles accurately reflected the information contained in the probate record. See Evid. R. 702(A). We find no abuse of discretion in this determination. The trial court could reasonably conclude that a jury could review the probate proceeding transcript and compare it with the newspaper articles without assistance. Although Epton and Goulden may be experts on journalistic standards and whether the articles comported with those standards, the trial court's ruling was based solely on the truthfulness of the articles and did not address issues of malice. *Page 8 
 {¶ 20} The second assignment of error is overruled.
 III {¶ 21} The Scaccias' first assignment of error states:
 {¶ 22} "THE TRIAL COURT ERRED IDENTIFYING OR PROPERLY APPLYING THE FACTS AND LAW RESULTING IN PREJUDICAL ERROR."
 {¶ 23} In their first assignment of error, the Scaccias claim that the articles contained several inaccuracies and omissions which, individually and collectively, amounted to defamation. They emphasize that the court should have looked at the overall "sting" of the articles, which allegedly suggested to the average reader that the Scaccias had exploited Hoffman — and perhaps acted criminally — when they received large amounts of money from him.
 {¶ 24} In reviewing the Scaccias arguments, the trial court compared the articles with the probate court record, which was provided in part by DNI as attachments to the affidavit of Jeffrey Sharkey, DNI's attorney, and by the Scaccias in their exhibits filed on January 12, 2001. We have done likewise.
 {¶ 25} (On appeal, the Scaccias complain that the trial court cited to Sharkey's affidavit 167 times while ignoring their experts' opinions. Unlike the Scaccias' expert's affidavits, Sharkey's affidavit merely authenticated the exhibits attached to DNI's motion for summary judgment. The trial court's citations to Sharkey's affidavit were references to the exhibits, i.e., the probate court record and the published articles.)
 {¶ 26} Although the underlying facts will be discussed in detail, infra, we begin with a cursory background. It is undisputed that Hoffman and the Scaccias were *Page 9 
neighbors, and they developed a close relationship. In 1995, Hoffman began to give substantial sums of money to Cynthia Scaccia. More than $300,000 in gifts was given to Cynthia in 1996 and 1997. In 1998, Bank One, Hoffman's bank, contacted APS due to concerns about certain checks that Hoffman had signed. This prompted APS to file a petition with the probate court, seeking to provide protective services to Hoffman. After meeting with Hoffman and holding hearings, the probate court made the following findings:
 {¶ 27} "* * * Charles E. Hoffman is 95 years of age; that he has had a distinguished career and is a man of sound mind and reasons in a logical manner. Further, the Court finds that Mr. Hoffman was not neglected, abused or exploited by third parties, but that as the Court has found, his memory loss has incapacitated his ability to administer to his financial affairs. He does, however, have a memory problem which interferes with any decision he might make concerning his finances. The Adult Protective Services under R.C. Section 5101.65 asks for a protected service plan.
 {¶ 28} "The concern of the Department of Human Services arose when the bank notified them that large expenditures were made by Mr. Hoffman. Mr. Hoffman has a considerable estate and is grateful to those who help him physically, medically and by taking care of his residence. These feelings are logical and for the most part the Court believes that he knows what he is doing. Again, the Court cannot forget that his memory problems interfere with his ability to make what others may call inappropriate monetary gifts.
 {¶ 29} "The Court further finds that Mrs. Cynthia Scaccia, a neighbor, who has some medical background provides for assistance in administering medication to Mr. *Page 10 
Hoffman, that she purchases his clothes, sees to it that he is clean, that she cooks for him, provides for his recreation and often appears to be providing services that require her time for a whole day.
 {¶ 30} "The Court finds that Mr. Hoffman is a proud man who knows what is going on and wishes to compensate Mrs. Scaccia and others and give them monetary gifts. As stated before, however, he will need some supervision in making gifts and since the Court makes the finding that he is physically infirm but a competent adult, but at this time a conservatorship is not necessary, but that the bank of his choice as his agent shall have the authority to pay any and all expenses that Mr. Hoffman has, such as clothing, utility and phone bills, and the like. It is Mr. Hoffman's desire that Mrs. Scaccia continue to tender her services to him and for that she should be compensated at the rate of not exceeding the amount of $75.00 per day. Further, that Mr. James Ambrose, the Attorney for Mr. Hoffman, would assist Mr. Hoffman in making any monetary gifts, said gifts not to exceed $5,000 to $10,000 per donnee [sic], per year, and that Mr. Ambrose is not to approve any big gifts without the prior consent and approval of the Court.
 {¶ 31} "It is hereby ordered that the durable Power of Attorney executed by Mr. Hoffman on January 29, 1997, is hereby voided by this Order so as to avoid any appearance of impropriety. Further, the Court requests the Department of Adult Protective Services to visit with Mr. Hoffman at his home two (2) times per month after giving Mr. Hoffman prior notice and that any findings by the Department of Adult Protective Services should be reported to the Court.
 {¶ 32} "It is the intent of this Order that Mr. Hoffman can continue with his life for *Page 11 
how many years he has left with dignity, but because of his affliction have some supervision from the person he trusts in making any monetary gifts."
 {¶ 33} After the probate court issued its order, the Dayton Daily News ran four news articles and one opinion piece about the probate case. We will address each of the articles in turn.
A. The September 20, 1998 News Article
 {¶ 34} The first article published in the Dayton Daily News appeared on September 20, 1998 under the headline: "Man's gift-giving causes concern." The subheading stated: "Checks to a city couple, totaling $500,000, prompt legal intervention." The article spanned several pages of the newspaper. It read:
 {¶ 35} "Dayton city prosecutor John Scaccia and his wife Cynthia accepted more than $500,000 in personal checks and credit card payments during a four-year span from a wealthy, elderly man whose competency has been brought into question by the Montgomery County prosecutor's office.
 {¶ 36} "Prosecutor's records show Cynthia Scaccia received large sums of money in checks she wrote to herself that were signed by the elderly man, often several times in a single week. Many of the notations on the checks labeled them as gifts.
 {¶ 37} "A Montgomery County judge put a strict limit on the man's giving Aug. 28, following a hearing in which county prosecutors contended the man was being exploited.
 {¶ 38} "Although he limited future gifts to the Scaccias, Montgomery County Probate Judge George J. Gounaris ruled the man was not being exploited. Had *Page 12 
Gounaris found the man had been exploited, prosecutors could have used the finding to pursue a criminal charge in the case.
 {¶ 39} "Despite the ruling, Debra Armanini, first assistant county prosecutor, said, `Our criminal investigation is still continuing.'
 {¶ 40} "The county investigation was sparked after the man's bank raised concerns about the checks. Since 1995, more than 150 checks to Cynthia Scaccia had passed through the bank for amounts of $1,000 or more.
 {¶ 41} "In the hearing before Gounaris, the elderly man objected to the inquiries from Montgomery County authorities and vouched for the Scaccias. Cynthia Scaccia serves as a caretaker for the man, who is in his 90s, has no immediate family and lives in the Scaccias' Dayton neighborhood.
 {¶ 42} "In a statement passed through his attorney, James T. Ambrose, the man said, `Cindy Scaccia did nothing improper. As I told Judge Gounaris, any money I gave Cindy in the past was a personal and private matter. I was under no compulsion and all the money she received was authorized by me and given of my own free will.
 {¶ 43} "`I did not appreciate the government's interference in my life these last few months. It was not welcome.'
 {¶ 44} "Ambrose, speaking on behalf of his client, declined to grant the Dayton Daily News an interview or a meeting with the man. The newspaper did not attempt to contact him at his home, as Ambrose said he is in frail health.
 {¶ 45} "Judge limits gifts
 {¶ 46} "The inquiry into the payments emerged while John Scaccia, chief of the criminal division of the Dayton law department, was an applicant for city law director; *Page 13 
Scaccia has since learned that he did not get the job.
 {¶ 47} "Scaccia, 44, has worked 15 years with the city law department. He earns $66,700 a year supervising a staff of 21 people charged with prosecuting thousands of misdemeanors brought into the city's municipal courts.
 {¶ 48} "John and Cynthia Scaccia declined requests for interviews through their attorney, Dwight Brannon.
 {¶ 49} "After 2 1/2 days of closed hearings last month, Gounaris ordered that Scaccia and his wife could receive no more than $10,000 a year in gifts from their elderly friend, and Cynthia Scaccia could take no more than $75 a day for any services she provided to the man. Although Gounaris had closed the hearings, the judge agreed on Sept. 1 to release his written decision and other documents that had been filed in the case.
 {¶ 50} "While ruling the man hadn't been exploited, Gounaris found the man's `memory loss has incapacitated his ability to administer to his financial affairs.' He authorized the man's bank, Bank One, to pay his expenses, voided the durable power of attorney the man had given to John Scaccia and asked the county's Adult Protective Services to visit the man twice a month.
 {¶ 51} "The elderly man, who has degrees in law and business, did not object to the decision by Gounaris, Ambrose said.
 {¶ 52} "`As Judge Gounaris and all the doctors have found, I am competent to manage my own life including my financial affairs,' the man's statement said. `During these last few months I have found it extremely difficult to protect and preserve my way of life. Judge Gounaris' decision helps protect me from government interference in my *Page 14 
life now or in the future. I am grateful for this.'
 {¶ 53} "Ambrose acknowledged the typed statement was prepared for the man's signature.
 {¶ 54} "After Gounaris released his written decision on the case to the Daily News, the newspaper sought to obtain transcripts of some of the testimony and evidence presented at the closed hearing, including testimony of Cynthia Scaccia and the elderly man. At Gounaris' invitation, Ambrose filed a motion on Sept. 4 to seal all of the court records. Gounaris said last week that he will not rule on the motion until Sept. 22 to give Ambrose more time to prepare legal research.
 {¶ 55} "Meanwhile, the newspaper used Ohio's public-records laws to obtain documents collected during the Montgomery County prosecutor's investigation, including three submitted typed documents that portray Cynthia Scaccia as a caretaker for the elderly man. The documents describe a close, personal relationship, coupled with assistance ranging from purchasing and cleaning the man's clothing to driving him to appointments, preparing his meals and even administering medications. Mrs. Scaccia is not a nurse, but she has some medical training.
 {¶ 56} "Bank raised concerns
 {¶ 57} "The issue of frequent, large gifts to the Scaccias surfaced in May, when Bank One contacted Adult Protective Services and raised concerns about checks for substantial sums of money drawn from his checking account. Adult Protective Services is a unit of county government that provides services and looks after the welfare of the elderly.
 {¶ 58} "Prosecutors tabulated 165 individual checks totaling $350,094 directly *Page 15 
payable to Cynthia Scaccia from September 1995 to May 1997. More than a third of the checks were for the exact sum of $2,000 each. Memos commonly written on the checks said the amounts were either for `family gift' or `gift.'
 {¶ 59} "On Oct. 1, 1996, for example, a series of five checks were written: two checks to Cynthia Scaccia for $2,000 each, and three checks totaling $7,545.53 to three different credit card companies. Prosecutors said the credit card checks went to accounts held by the Scaccias. John Scaccia received four checks totaling $925 in 1995 for services provided that year, prosecutors' records show.
 {¶ 60} "Prosecutors also obtained federal gift tax returns for 1996 and 1997 that were prepared for the man's signature by a certified public accountant. The returns, included in the prosecutor's files, show Cynthia Scaccia received $155,000 in gifts from the man in 1996 and $143,000 in 1997. The 1997 return also shows the man's housekeeper received $15,600 in gifts and his landscaper $4,000.
 {¶ 61} "The returns do not reflect the $130,279 prosecutors found was drawn from the elderly man's checking account in 1996 and 1997 to pay the Scaccias' credit cards. Ambrose said amended tax returns were being considered to include the credit card payments.
 {¶ 62} "A spokeswoman for Bank One declined comment. But Fred Lawman, a Canton-based bank security consultant and retired U.S. Secret Service agent, said bank employees are advised to be watchful for extraordinary activity in customer accounts, particularly those held by elderly customers. Key examples include an unusual number of checks written from an account, checks made out by one person and signed by another and checks written for unusually large sums. *Page 16 
 {¶ 63} "The Bank One inquiry got a quick response. County prosecutors, representatives of Adult Protective Services and the man's probate attorney met at the man's home May 22 and obtained his signature on a document that consented to the provision of protective services by APS. But on May 26, this time represented by Ambrose, the man revoked his consent to APS oversight, the attorney said.
 {¶ 64} "Intervention criticized
 {¶ 65} "Ambrose criticized the initial intervention, contending there should have been some advance notice given to him and his client.
 {¶ 66} "`I felt then and I still feel now that the investigation conducted by APS and the prosecutors was done in a fashion that resembled the Nazi storm troopers, in that they came to my client's home without notice or regard for my client's emotional and physical well-being, although I don't believe they intended to cause him any harm,' Ambrose said.
 {¶ 67} "Brian McHenry, one of two assistant county prosecutors who took the case to Gounaris, recalled that the elderly man's probate attorney, Crofford Macklin, was present at the first visit by APS. Macklin declined comment on the case.
 {¶ 68} "On June 1, Assistant Montgomery County Prosecutor Mona Guerrier, representing APS, asked Gounaris for authority to provide the elderly man with protective services.
 {¶ 69} "Guerrier's petition contended the man was `unable to account for the large withdrawals from his bank account and important personal documents and assorted paperwork were found scattered throughout his home.' She also found he `has neglected some aspects of the activities of daily living.' *Page 17 
 {¶ 70} "Gounaris responded by holding a hearing in the man's home June 8, attended by Ambrose, APS representatives and prosecutors.
 {¶ 71} "`(The man) met with approximately nine people in his living room, at which time he could not recall specific checks when asked at that time,' Ambrose said. `I noticed (the elderly man) did not know exactly what day it was, but he remembered that Lucent Technologies was up three points that day . . . He told me it's not important to know what day it was. What is important is what you do during that day. That sums up my client.'
 {¶ 72} "Evaluations ordered
 {¶ 73} "After meeting the elderly man, Gounaris ordered physical and mental evaluations and scheduled more hearings.
 {¶ 74} "Each of the experts who evaluated the man found him to be competent to handle his financial affairs. However, there is no mention in the records that those experts were advised of his pattern of giving to the Scaccias, such as the frequent and similar amounts written on the same day.
 {¶ 75} "Dayton psychologist Phyllis Kuehnl, who found the elderly man `completely competent to manage his own affairs and provide for his own personal needs at this time,' said information about the numerous checks, their frequency and amounts would not have changed her opinion.
 {¶ 76} "`He (the elderly man) described them (the Scaccias) to me as the only family that he's got,' said Kuehnl, a forensic psychologist.
 {¶ 77} "Kuehnl confirmed Mrs. Scaccia worked as her secretary in the late 1980s and early 1990s. She also confirmed that the elderly man had made payments *Page 18 
to her through Mrs. Scaccia (court records show $1,000 in 1996 and $1,000 in 1997) to pay for counseling services for people referred to her by Mrs. Scaccia.
 {¶ 78} "Dr. Sherry Wheaton, a Dayton physician featured on WHIO-TV news and a specialist in geriatrics, also evaluated the man for Gounaris. She found some mental impairment.
 {¶ 79} "The elderly man told Wheaton that he read two newspapers and several magazines, but `he was not able to tell me any of the current events at this time,' Wheaton stated in her report to Gounaris.
 {¶ 80} "`He also had difficulty giving me any of his medical history,' she noted. `He was not aware that he had been admitted for a (pacemaker). He was also unable to give me any history about his urologic care.
 {¶ 81} "`Although (the elderly man) does have some difficulty with his long-term and short-term memory, he was very capable of talking about his living situation,' Wheaton wrote. `He was very positive about the interaction he has with Mr. and Mrs. Scaccia and is certainly receiving excellent care.'
 {¶ 82} "Citing privacy concerns, Wheaton declined to discuss her evaluation and referred all questions to Gounaris.
 {¶ 83} "Michael J. Finton, a clinical neuropsychologist who also evaluated the man, said the man was competent to handle his financial affairs despite `greater than expected impairments in naming and your ability to process information quickly.'
 {¶ 84} "Finton also found the man's memory functioning revealed difficulties in learning stories, word lists, and geometric figures, and there was also evidence of possible rapid forgetting of verbal information over time. *Page 19 
 {¶ 85} "`Overall, however, I believe that you are competent to make decisions regarding your own care, understand your business affairs, investments, and gifts, and act in your own best interests,' Finton wrote. `In light of your physical limitations, you would continue to benefit from your extensive daily interactions with Mr. and Mrs. Scaccia.'
 {¶ 86} "In an interview, Finton said the man never mentioned the numerous payments to Mrs. Scaccia, even when asked about his giving.
 {¶ 87} "But while such information `would have been nice to have known beforehand,' Finton said, it wouldn't have changed his opinion about the elderly man's competency.
 {¶ 88} "Guardian sought
 {¶ 89} "In its Aug. 14 petition for protection, the prosecutor's office sought to place the man under a court-appointed guardian, arguing that the substantial and consistent payments show the man had been exploited.
 {¶ 90} "`Numerous checks for substantial amounts have been written to his caretaker, as well as payments to his caretaker's individual and/or joint bank credit card accounts, department store accounts, and other credit obligations held by the caretaker, all for the personal benefit, profit, or gain of the caretaker and others,' the petition states.
 {¶ 91} "After hearing testimony from Cynthia Scaccia and the elderly man, Gounaris concluded the man was `not neglected, abused or exploited by third parties.'
 {¶ 92} "The judge further found that the elderly man `has a considerable estate and is grateful to those who help him physically, medically and by taking care of his *Page 20 
residence.
 {¶ 93} "The court further finds that Mrs. Cynthia Scaccia, a neighbor, who has some medical background, provides for assistance in administering medication to (the elderly man), that she purchases his clothes, sees to it that he is clean, that she cooks for him, provides for his recreation and often appears to be providing services that require her time for a whole day.
 {¶ 94} "The court finds that (the elderly man) is a proud man who knows what is going on and wishes to compensate Mrs. Scaccia and others and give them monetary gifts.'
 {¶ 95} "McHenry said last week that county prosecutors have until next week to appeal the case.
 {¶ 96} "`Our major goal was to protect (the man's) assets,' McHenry said. `Whether or not the court finds he was exploited, abused or neglected, the remedy is the same.' McHenry said the civil law for adult protection does not provide for seeking the return of any funds spent before the legal action is brought.
 {¶ 97} "Dwight Brannon, who represents the Scaccias, said, There is no showing John used his office or committed any wrongdoing.'"
 {¶ 98} The article referred readers to page 10A, where a headline read: "INQUIRY: Repeated, large checks cause concern." The page contained a chart that indicated the dates, amounts, and memo notations for checks written by Hoffman to Cynthia Scaccia between May and July 1996. A summary above the chart, titled "A parade of checks," stated that "[r]ecords obtained from the Montgomery County Prosecutor's office show Cynthia Scaccia received large sums of money in checks she *Page 21 
wrote to herself that were then signed by an elderly neighbor. Prosecutors contended the man was exploited." A copy of a check payable to Cynthia Scaccia in the amount of $1,000 was also included. A summary below the chart indicated that the Scaccias had received from Hoffman a total of $26,419 in 1995, $403,182.22 in 1996, $57,747.70 in 1997, and $68,300 in 1998.
 {¶ 99} In its decision, the trial court incorporated a table comparing the text of the article with sources from the probate record. We will not repeat the table herein. Suffice it to say, a review of the probate record reveals that the article reasonably sets forth the basis for the prosecutor's investigation and petition and the procedural history of the probate case. Each of the individual factual assertions regarding the Scaccias, Hoffman's mental condition, and the probate hearing testimony are amply supported by the transcript.
 {¶ 100} The Scaccias claim that the article omitted information, leading to misconceptions about Hoffman and the Scaccias. Specifically, they argue that the articles misrepresented Hoffman's medical condition, the duration of Hoffman's mental condition, and statements made by Hoffman through his attorney. As discussed below, we do not find that any omissions substantially affected the truthfulness of the articles.
1. Hoffman's medical condition
 {¶ 101} First, the Scaccias assert that, while the articles acknowledged that all experts found Hoffman to be competent, the findings were presented such that a reasonable reader would conclude "competency is marginal or a technicality which should not have cleared Appellants of the accusations." The Scaccias argue that *Page 22 
significant information about Hoffman's mental condition was missing or misstated in the articles, leaving readers with the impression that he was "seriously afflicted."
 {¶ 102} As noted by the article, Dr. Phyllis Kuehnl-Walters, Dr. Sherry Wheaton, and Dr. Michael Finton evaluated Hoffman, filed reports, and testified about his condition during the probate proceedings.
 {¶ 103} Kuehnl-Walters, a forensic psychologist, examined Hoffman on June 5, 1998 at the request of Hoffman's counsel. In her report, Kuehnl-Walters indicated that Hoffman's long-term memory was intact. She stated that he described his youth, adulthood and aging years, including his education and military service. He also recalled such things as what he had eaten for breakfast and the purpose of the evaluation after two hours of participation. She stated that Hoffman's "recent or short-term memory is essentially limited by his motivation and personality. He thinks through what he wants to say prior to saying it. He tends to repeat himself but only on matters of importance to him. It is as though he wants to be sure he is heard and understood." She noted that Hoffman is insightful and that his reasoning and judgment are intact. She concluded that Hoffman was "completely Competent to manage his own affairs and provide for his own personal needs at this time."
 {¶ 104} At the hearing, Dr. Kuehnl-Walters first acknowledged that Hoffman had paid her $6,000 over a year and a half to underwrite therapy for others; Kuehl-Walters stated that Cynthia Scaccia had contacted her, saying that Hoffman wanted her to see certain families and that Hoffman wanted to pay anonymously.
 {¶ 105} Kuehnl-Walters then testified that Hoffman's long-term memory was "pretty well" but his short-term memory was limited. She indicated that Hoffman's *Page 23 
short-term memory "can be pretty good" with cues to help him. She stated: "[I]n my professional opinion * * * he is capable of taking in new information and retaining it, and that's what we call short-term memory storing. * * * I also have an opinion that he needs tools to do that." Tools could mean such things as legal pads or people. Kuehnl-Walters found no other mental disorder.
 {¶ 106} Kuehnl-Walters stated her opinion that Hoffman was competent to handle his business and health affairs "as long as he has * * * trusted support around him." Kuehnl-Walters stated that she did not talk to Hoffman about his financial affairs. She believed, however, that he could handle routine bills. Hoffman might get confused with intermittent payments. Kuehnl-Walters indicated that Hoffman sees the Scaccias as family.
 {¶ 107} Dr. Wheaton assessed Hoffman on June 23, 1998. Hoffman was brought to the appointment by the Scaccias. While Hoffman was being weighed and examined by a nurse, the Scaccias were asked about and provided Hoffman's medical history. When Dr. Wheaton later spoke with Hoffman about his medical history, Hoffman had difficulty recalling it. Although he had some mild impairment with his short-term memory, he was able to recall three objects after two to three minutes. Testing revealed that his memory had not deteriorated since 1995; in fact, it had improved. Dr. Wheaton's report stated: "Although Mr. Hoffman does have some difficulty with his long-term and short-term memory, he was very capable of talking about his living situation. He was very positive about the interaction he has with Mr. and Mrs. Scaccia and is certainly receiving excellent care."
 {¶ 108} In her testimony, Dr. Wheaton stated that Hoffman had *Page 24 
deficiencies with his long-term and short-term memory but did not have severe progressive dementia. She opined that Hoffman knew what he was doing when he is doing something, and she believed that Hoffman could make his own decisions about gifts, business affairs, and his best interest. Wheaton was not surprised, however, to learn that Hoffman might have difficulty recalling that he wrote checks. When asked about whether Hoffman needed assistance with his finances, Wheaton responded: "I think he needs some structure in paying his bills, and he's receiving some, but I think * * * that's important he has some guidance, and I think he would frequently admit that he does need some help." Later, Judge Gounaris questioned Wheaton about Hoffman's statements that he did not recall $10,000 in payments to Tonya Cooper, his housekeeper. The following exchange occurred:
 {¶ 109} THE COURT: "* * * And then I want you to know, Doctor, that we were — I was over at his house with these same people about a month ago.
 {¶ 110} WITNESS: "Uh-huh.
 {¶ 111} THE COURT: "And went through these checks, and he has a housekeeper, and in five consecutive weeks at April and May, he gave $2,000 a week to his housekeeper. I indicated to him at that time that I'd like to be his housekeeper, but the position is already taken. And I said, `Do you realize that's $10,000 in five weeks?'
 {¶ 112} THE WITNESS: "Uh-huh.
 {¶ 113} THE COURT: "And he said to me, in front of everyone else, `No way,' which gave me some concern. And that's why we're [here] today. No way did I give her $10,000 in five weeks. He didn't remember that he gave her 2,000 the first, *Page 25 
second, third and fourth weeks, and that's what concerns me. And what we really want to find out is, does this man need help-
 {¶ 114} THE WITNESS: "Uh-huh.
 {¶ 115} THE COURT: "— in reminding him that he gave somebody something or whatever. Okay? So with that in mind, what is your opinion?
 {¶ 116} THE WITNESS: "I — and I think it's highly likely he could do that and forget. That is short-term memory, that he could write something and a week later forget that he had done that. And if he had remembered, maybe he doesn't give another $2,000 to his housekeeper the fifth week, the fourth week. That's very possible."
 {¶ 117} "* * *
 {¶ 118} THE COURT: "What does he need?
 {¶ 119} THE WITNESS: "He needs to be independent possibly with someone guiding him so he's not vulnerable."
 {¶ 120} Dr. Wheaton stated that she believed the Scaccias "definitely * * * are giving him some structure and taking care of his physical and medical needs." Wheaton indicated that she would expect Hoffman's short-term memory to be shorter in a stressful situation.
 {¶ 121} When asked if Hoffman was competent, Wheaton responded, "I don't know that I can answer that. I guess if — what I would say is that if you sat down with him and said, `Did you know you gave your cleaning lady $10,000,' I mean, I hope you did that this morning. I don't know what he said. If he said, `No, I don't know that I did that,' then I think you got your answer answered, that you need to find somebody to *Page 26 
help organize."
 {¶ 122} Finally, Dr. Finton, a clinical neuropsychologist, examined Hoffman. Finton's report stated, in pertinent part:
 {¶ 123} "As we discussed, the results from your assessment revealed greater than expected impairments in naming and your ability to process information quickly. Notably, although you also had difficulty figuring out things that were unusual or novel in some way, you were able to solve these problems when given adequate time. Memory functioning revealed difficulties in learning stories, word lists, and geometric figures, and there was also evidence of possible rapid forgetting of verbal information over time.
 {¶ 124} "You noted that you were experiencing significant pain during the evaluation related to your diagnosis of bullous pemphigoid, and this may indeed have exacerbated your cognitive symptoms. In addition, you may find that your symptoms become more prominent in situations in which you are under stress or are required to make decisions quickly.
 {¶ 125} "Overall, however, I believe that you are competent to make decisions regarding your own care, understand your business affairs, investments, and gifts, and act in your own best interest. In light of your physical limitations, you would continue to benefit from your extensive daily interactions with Mr. and Mrs. Scaccia. Furthermore, due to concerns regarding possible falls, reasonable safeguards should be implemented during nighttime hours."
 {¶ 126} Testifying by telephone, Finton reiterated to the probate court that he believed that Hoffman was "absolutely competent" to make decisions regarding *Page 27 
investments, gifts, and his business affairs. Finton indicated that Hoffman was able to decide where his money goes. When Judge Gounaris raised concerns about the $10,000 to Cooper, Finton responded that it was a reasonable concern. Finton testified that Hoffman knows what he is doing at the time, but he has difficulty recalling it later, consistent with Parkinson's Disease. Finton indicated that this a problem with retrieving the information, which is remedied by having a ledger or similar aid.
 {¶ 127} Upon review of the transcript, the doctors' testimony revealed that the doctors recognized that Hoffman's short-term memory was limited and that he required some aid to help him remember payments. The doctors testified that, with such aids, Hoffman was competent to manage his finances. Comparing the doctors' statements to the article, we find no genuine issue of material fact as to the truthfulness of the reporting. Although the newspaper reported only portions of the doctors' reports, the September 20 article accurately reported both the deficiencies and the doctors' conclusions that Hoffman was competent to manage his financial affairs.
2. The duration of Hoffman's medical condition
 {¶ 128} Second, the Scaccias also claim that the September 20 newspaper article (as well as the October 26 article) created the impression that Hoffman's mental condition was the same in 1998 and prior years. The Scaccias argue that the articles incorrectly implied that Hoffman was substantially impaired when the gift-giving began in 1995.
 {¶ 129} We agree with the Scaccias that the articles do not distinguish Hoffman's mental condition in 1998 from prior years. However, the articles reported *Page 28 
that the probate court found Hoffman to be competent in 1998, although his short-term memory necessitated some assistance.
 {¶ 130} The evidence on Hoffman's mental condition has been discussed in detail above. We reiterate that all of the doctors found Hoffman to be competent in June 1998, albeit with some short-term memory impairment. Dr. Wheaton reported that Hoffman's short term memory had not deteriorated since 1995 and, in fact, had improved. In contrast, Macklin testified that he found Hoffman to be a "very sharp individual" in January 1997, although he noticed that Hoffman was unable to recognize checks in May 1998. Hoffman's attorney argued that Hoffman's inability to recognize checks in 1998 was influenced by the unexpected and stressful nature of the May 1998 inquiry. Based on the probate court record, the newspaper did not misrepresent the record by failing to distinguish Hoffman's condition in 1998 from prior years. 3.Statements through Hoffman's attorney
 {¶ 131} Third, the Scaccias assert that the newspaper's reporting of Hoffman's statements through his attorney make those statements appear to lack credibility. The Scaccias argue: "The problem with the September 20th article is the statement appears to contradict findings of the probate court and that silly Mr. Hoffman only thinks he is still in charge of his finances." There is no such implication in the article.
 {¶ 132} In sum, we conclude that the trial court properly determined that the September 20, 1998 article was substantially truthful. Summary judgment was properly granted with respect to this article.
 B. The September 23, 1998 News Article *Page 29 
 {¶ 133} The second news story was a single paragraph under the heading, "Judge to rule soon on status of man's competency records." The article stated:
 {¶ 134} "Montgomery County Probate Judge George J. Gounaris said Tuesday he will decide soon whether to make public court records in a case in which Dayton city prosecutor John Scaccia and his wife, Cynthia, accepted more than $500,000 in personal checks and credit card payments during a four-year period from an elderly Dayton man. Attorneys for theDayton Daily News argue that exhibits and a transcript of the closed hearings before Gounaris regarding the elderly man's competency are public records. Gounaris released his written decision and other documents Sept. 1. The elder man's attorney, James T. Ambrose, opposed release of the transcript."
 {¶ 135} We see nothing untruthful in this news article, nor is the article written in such a way that the true statements result in a misrepresentation to the average reader. The article's statement that the Scaccias had accepted more than $500,000 from an elderly man is an objectively stated fact and this fact was the primary impetus for the probate hearing. The article did not imply any wrongdoing on the part of the Scaccias, nor did the newspaper misrepresent the nature of the case by summarizing the probate case in this manner.
 {¶ 136} The trial court properly granted summary judgment to DNI and its employees regarding this article.
C. The September 29, 1998 News Article
 {¶ 137} On September 29, 1998, the Dayton Daily News published another single paragraph article regarding whether the records in the Hoffman probate *Page 30 
case would be sealed, this time under the heading: "Judge won't seal records in elderly man's case." The article read:
 {¶ 138} "Montgomery Count Probate Judge George J. Gounaris on Monday denied a motion to seal records in a case in which Dayton city prosecutor John Scaccia and his wife, Cynthia, accepted more than $500,000 in personal checks and credit card payments from an elderly Dayton man during a four-year period. Attorneys for the Dayton DailyNews are seeking the exhibits and a transcript of closed hearings before Gounaris regarding the elderly man's competency. The elder man's attorney, James T. Ambrose, opposed release of the records."
 {¶ 139} The September 29 article's reference to the Scaccias is virtually identical to the reference in the September 23, 1998 article. Again, the statement merely indicates that the probate case involved the Scaccias, who received $500,000 from an elderly man. This is a truthful and reasonably-stated summary of the case. The trial court did not err in granting summary judgment to DNI and its employees concerning the September 29, 1998 article. D. October 26, 1998 News Article
 {¶ 140} On October 26, 1998, another substantial news article was published under the headline, "Thanks Half a Million? Maybe not." The subheading stated, "Prosecutors claim a city official and his wife have exploited an older neighbor for years." In its entirety, the October 26 article read:
 {¶ 141} "Soon after Cynthia Scaccia began to get hundreds of thousands of dollars from a wealthy, older Dayton neighbor, she took the man to a Waynesville antiques shop that had a desk she and her husband, John, had been eyeing for years. *Page 31 
 {¶ 142} "There, at Baker's Antiques in Washington Square, 98 S. Main St., according to Mrs. Scaccia, the man signed a $15,000 check she used April 10, 1996, to buy the desk.
 {¶ 143} `He sat out in the car. I went in,' Mrs. Scaccia testified July 22 at a hearing sought by county prosecutors, who contended the Scaccias exploited him. `He said, "I want to do something special for you and John for your birthday this month."'
 {¶ 144} "The desk was bought during the height of gifting to Cynthia, now 36, and John Scaccia, now 44 and chief of Dayton's prosecutor's office. The gifts totaled more than $500,000 before they came under prosecutors' scrutiny last summer.
 {¶ 145} "After the Dayton Daily News reported the controversy Sept. 20, transcripts of three days of closed hearings were provided to the Daily News.
 {¶ 146} "The man, who is in his 90s, seemed confused when he testified July 22 before Montgomery County Probate Judge George J. Gounaris, according to the transcripts. He mixed up the name of his housekeeper with Mrs. Scaccia's, expressed surprise he had more than $1 million in assets and insisted he could never have contributed the totals that went to pay off the Scaccias' debts or purchases.
 {¶ 147} "After the hearings, Judge Gounaris on Aug. 28 ordered that Scaccia and his wife could receive no more than $10,000 a year in gifts from their elderly friend, and ordered any future large gifts from the man be brought to his attention. But he declined to put the man under full authority of Adult Protective Services or to find the man was exploited.
 {¶ 148} "After the Daily News report Sept. 20, Scaccia was moved from *Page 32 
the Dayton Safety Building to the city law department's main office at City Hall. Scaccia retained his title and authority as chief of the city's criminal division, but he was assigned additional work on civil litigation and contracts while the city awaits the county prosecutor's decision on whether charges will be filed, said Rita McNeil, Dayton law director.
 {¶ 149} "Debra Armanini, first assistant county prosecutor, said Friday that her staff's investigation into the matter remained open. Dwight Brannon, who represents the Scaccias, said an assistant county prosecutor told him the investigation had already ended.
 {¶ 150} "The transcripts clearly showed the Scaccias did nothing wrong,' Brannon said. `And it was the intent of the gentleman to provide these gifts to Cynthia Scaccia and that the inquiry into these purely private matters is an invasion of privacy.'
 {¶ 151} "The man is not being identified in this story to protect him.
 {¶ 152} "Brannon said the `implications of the past story by the paper are untrue.' He declined to be explicit.
 {¶ 153} "According to transcripts of closed hearings in July and August, Mrs. Scaccia testified the man's gifts paid for more than $10,000 in landscaping, plus about $200,000 of credit card debt, including a $20,000 student loan.
 {¶ 154} "Most amounts were paid by checks written by Mrs. Scaccia and signed by the man, who has no immediate family and lives in their Dayton neighborhood.
 {¶ 155} "Another Dayton attorney, Crofford Macklin, who prepared the man's will in January 1997, recalled what happened in May 1998 when he, *Page 33 
representatives of Adult Protective Services and an assistant county prosecutor interviewed the man at his home after officials at Bank One raised concerns. Since 1995, more than 150 checks to Cynthia Scaccia had passed through the bank for amounts of $1,000 or more.
 {¶ 156} "`He didn't seem to recognize checks,' Macklin testified. `He didn't seem to understand the nature of checks that had been written and what was happening with his financial matters.'
 {¶ 157} "Macklin said he met with the man three days later and there was no change. That's when the man signed a voluntary consent for Adult Protective Services that was revoked a week later with the assistance of his new attorney, James Ambrose.
 {¶ 158} "`I don't have money like that'
 {¶ 159} "At the hearing, the elderly man was questioned by Mona Guerrier, assistant county prosecutor.
 {¶ 160} "`Are you surprised at all that for the month of April of this year alone, you wrote her (Mrs. Scaccia) checks totaling $8,500?' Guerrier asked him.
 {¶ 161} "`I'd be surprised at that,' the man said.
 {¶ 162} "`Why is that?' Judge Gounaris asked.
 {¶ 163} "That's more than I would give at one time,' the man answered. `I don't have money like that.'
 {¶ 164} "Judge Gounaris asked the man about gift tax records that showed he had given Cynthia Scaccia $155,000 in 1996 and $143,000 in 1997. Prosecutors later learned he actually gave about $400,000 to the Scaccias in 1996. *Page 34 
 {¶ 165} "`And you did that because why? $300,000,' Gounaris asked.
 {¶ 166} "`Do you understand the question?' Ambrose, the man's attorney, interjected.
 {¶ 167} "`Yes,' the man said. `I'm just trying to — we worked together on different things, and when she felt she had difficulty meeting her obligations, I helped her a bit.'
 {¶ 168} "The man's testimony contradicted some of Cynthia Scaccia's later testimony.
 {¶ 169} She insisted she spent six to eight hours with him each day, ferried him to more than 80 medical appointments over several years, bought his clothing from catalog stores with her credit cards and hired a painter to paint his home. She said she also attended to his personal hygiene and often applied medications. But she insisted that none of the money she had accepted had been payment for services, only voluntary gifts.
 {¶ 170} "The man recalled the relationship differently.
 {¶ 171} "`How many hours a day is Cindy with you, approximately?' Ambrose asked. `I know it's different from day to day.'
 {¶ 172} "`It doesn't work out that way,' the man said. `Just when I have need I call her.'
 {¶ 173} "`Do you call her daily?' Ambrose asked.
 {¶ 174} "`No,' the man said.
 {¶ 175} "`Call her several times a week?'
 {¶ 176} "`Yes,' the man said. `Several times a week. We have a close — she *Page 35 
and her husband, John, and I have a close association, and so we work together. We do certain things together. We have over a period of time.'
 {¶ 177} "The transcript showed:
 {¶ 178} "* The man couldn't recall that he still employed a housekeeper who received more than $15,000 in gifts from him.
 {¶ 179} "* The man relied on typed notes he said he had prepared with the help of his housekeeper. But his attorney, Ambrose, had to correct him, pointing out that Mrs. Scaccia had prepared the notes. Ambrose also had to clarify Mrs. Scaccia's name for him.
 {¶ 180} "* The man had prepared a power of attorney for John Scaccia and Scaccia prepared some of the man's income tax returns and is executor of the man's will.
 {¶ 181} "* Most gifts to the Scaccias were written on checks from a 4000 series while checks for the man's personal needs or routine bills were mostly written on a 2000 series. Mrs. Scaccia claimed he maintained correct balances in a pair of check ledgers and transferred the numbers from one to the other.
 {¶ 182} "The man denied Mrs. Scaccia's version that he had given a `gift' of $4,000 to a woman neighbor who had moved to Michigan, claiming it was only a loan.
 {¶ 183} "Ambrose claimed the man's short-term memory lapses interfered with his testimony at the July 22 hearing.
 {¶ 184} "At a later hearing in August, Ambrose tried to clarify the man's testimony with several recordings of unsworn statements the man gave Ambrose by *Page 36 
phone weeks after he testified.
 {¶ 185} "`I never planned to be a millionaire,' the man said on the tape.
 {¶ 186} "The money I gave Cynthia Scaccia was a personal and private matter. I was under no compulsion to do that. And I did it under my own free will. . .
 {¶ 187} "`Weeks or months later I may not, without notes, be able to explain the particular check, but at the time I wrote the check I had very good reason to issue that.
 {¶ 188} "`I am aware that in 1998 I gave Cynthia Scaccia over $61,000. I also am aware the total I gave Cynthia Scaccia for the last three years is about $384,000,' the man's statement said, still missing the total by more than $100,000.
 {¶ 189} "In a separate tape Ambrose prepared later, the man said it didn't matter whether the amount was $384,000 or $497,000.
 {¶ 190} "This was not neglect, exploitation or anything else,' Ambrose said Thursday.
 {¶ 191} "It was a shock.'
 {¶ 192} "In her testimony, Mrs. Scaccia said her relationship with the man became close only in the last few years.
 {¶ 193} "`You know, I knew nothing about his money situation,' Mrs. Scaccia testified. `He always lived in the same house. He always dressed nice. He drove a Dodge (Dart) Swinger, an old car. A beat-up looking — he's always doing things, charity work and Bible teachings and every week down at the church. . .
 {¶ 194} "`Except for our family outings and things we did together, he never discussed money. Not even with me. And so it was a shock when he started *Page 37 
paying me. I was, you know, humbled, and I was like, this is not happening.'
 {¶ 195} "Mrs. Scaccia said the gifting began after the man turned 90.
 {¶ 196} "`He's a very independent man,' Mrs. Scaccia testified. `And it's hard to describe this because he's giving up his independence very gradually . . . First it was his car. That was a big thing.'
 {¶ 197} "She sold the car and bought a van.
 {¶ 198} "Then, she said, the man began asking her to charge clothing for him on her credit card and he would reimburse her.
 {¶ 199} "Mrs. Scaccia said that, as she began to write checks at the man's direction and for his signature, his bank called to report he had overdrawn his account. She said she took the man to the bank and they arranged for her to call the bank to check on the balance as checks from stocks or other income sources came in.
 {¶ 200} "`He checks his balance. He sees what he's got. And . . . he said, you know, "Let's see, I've got, you know, X amount of dollars. I want to pay you this much." . . . He likes giving to others.'
 {¶ 201} "That's not how Judge Gounaris saw it as the third day of hearings began.
 {¶ 202} "`After talking to this guy . . . I find he has a remarkable mind, just remarkable, and he knows what he wants to do and he has been doing what he wants to do,' Gounaris said.
 {¶ 203} The judge added, `He forgets and pays again and pays again and pays again, and he may be influenced in the sense that these people are taking care of him all the time. He says, "I want to give somebody some money. I want to give *Page 38 
somebody some money." . . . Because of his memory he will give more than he intentionally wanted to. For that reason, we have to watch him and make sure that he doesn't.'
 {¶ 204} "Ambrose said he began Sept. 11 to review check requests
prepared by the man with the help of Mrs. Scaccia. The requests are then forwarded to a bank, which cuts the checks. Ambrose said Mrs. Scaccia no longer uses her charge or credit cards to make purchases for the man."
 {¶ 205} As with the September 20 article, the Scaccias assert that the overall "sting" of the October 26 article was untruthful and that several specific statements in the October 26 article were not substantially true. In particular, the Scaccias challenge statements relating the power of attorney, attributing facts regarding Tonya Cooper to Cynthia Scaccia, and giving the general impression that Hoffman was not capable of correctly remembering his financial matters. 1. Power ofAttorney
 {¶ 206} The Scaccias further claim that the Dayton Daily News misrepresented the probate court's decision when it reported that Judge Gounaris had "voided the durable power of attorney [Mr. Hoffman] had given to John Scaccia." The Scaccias argue that the durable power of attorney was never "given" to Scaccia and Scaccia never "possessed" it.
 {¶ 207} According to the testimony of Attorney Crofford Macklin, Macklin was contacted by John Scaccia regarding estate planning for Hoffman. Macklin met with Hoffman in mid-January 1997, and he was retained by Hoffman to do his estate planning. Macklin prepared a will, a durable power of attorney for financial matters, an *Page 39 
affidavit, and an escrow letter. (The escrow letter would have authorized Macklin to hold onto the power of attorney documents for Hoffman until Hoffman or a physician told Macklin that Hoffman was incompetent.) Macklin testified that Hoffman signed the will and the power of attorney documents on January 29, 1997. John Scaccia was named as the attorney-in-fact and the executor of Hoffman's estate. Hoffman declined to sign the escrow letter, choosing instead to hold onto the executed copies of the power of attorney himself. Cynthia also testified that Hoffman had signed a durable power of attorney making John his attorney-in-fact should he ever become incapacitated. There was no evidence that John Scaccia had used the power of attorney. In its decision, the probate court "ordered that the durable Power of Attorney executed by Mr. Hoffman on January 29, 1997, is hereby voided by this Order so as to avoid any appearance of impropriety."
 {¶ 208} Based on the probate court record, it is clear that Hoffman executed a power of attorney naming John Scaccia as his attorney-in-fact and that Hoffman intended, at some future time, to give Scaccia the authority to act as his attorney-in-fact. Because there is no evidence that Scaccia physically received the power of attorney document from Hoffman, it is possible to construe the statement that Hoffman "had given" a power of attorney to Scaccia as inaccurate. However, if even the statement could be misinterpreted to mean that Scaccia had received the power of attorney document, we find no material difference in the meaning of the article. The newspaper did not report or suggest that Scaccia had used the power of attorney, and it accurately reported that the probate court voided the power of attorney executed by Hoffman. In short, even assuming that the phrase "had given" was misleading, we find *Page 40 
nothing defamatory in this reference or in the article as whole as a result of the mistatement.
2. Substitution of Cynthia Scaccia for Tonya Cooper
 {¶ 209} Next, the Scaccias challenge the portion of the October 26 article that cites questions by Assistant County Prosecutor Guerrier to Hoffman about whether he was surprised that he had written $8,500 in checks during April 1998. Hoffman responded to the question, stating, "I'd be surprised at that." Hoffman explained that "[t]hat's more than I would give at one time. I don't have money like that." In parenthesis, the newspaper incorrectly clarified that the checks had been written to Mrs. Scaccia. The transcript reveals that Guerrier's question concerned $8,500 given in April 1998 to Tonya Cooper, Hoffman's housekeeper, not to Cynthia Scaccia. Clearly, the reference to Cynthia Scaccia was a misstatement by DNI.
 {¶ 210} As noted by the trial court, however, Hoffman was also questioned about checks to Cynthia Scaccia in April 1998, totaling $16,500. When asked about whether $16,500 sounded accurate, Hoffman responded, "It — it did not sound accurate." Based on this testimony, we agree with the trial court that, although the reference to Cynthia Scaccia instead of Tonya Cooper was inaccurate as to the $8,500, the misstatement did not substantially alter the truthfulness of the article where Hoffman expressed concern over his payments to both Cooper and Cynthia Scaccia in April 1998.
3. Omissions about Hoffman's understanding of his finances
 {¶ 211} Third, the Scaccias claim that the newspaper omitted references to the record that would have demonstrated that Hoffman generally understood the *Page 41 
nature and amount of his gift-giving and other payments to others. The Scaccias argue that these omissions gave the false impression that the Scaccias had taken advantage of Hoffman.
 {¶ 212} Hoffman's testimony about his financial status varied. Initially, Hoffman was asked about his relationship with Tonya Cooper. He described her as a friend, not an employee, who worked for him "a number of years back" as a housekeeper. Hoffman could not recall if Cooper worked for him in 1998, but he indicated that he had not seen her for some time. Hoffman stated that Cooper came when he needed her, not every week, and that he paid her based on what she did. Upon reviewing notes of checks he had written, Hoffman mistakenly stated that Cooper had helped type the notes when Cynthia Scaccia had helped him.
 {¶ 213} As stated above, Hoffman was asked about the payments he made to Cooper in April 1998, totaling $8,500. Hoffman expressed surprise at the total, stating that he did not "have money like that." Hoffman was later asked again about these payments. He again stated: "I don't have money like that. During the year, Christmas time and special occasions, that's something else. But during the year, I have a person in my employ, and I pay them for what they've done." Upon questioning by the court, Hoffman further testified that the payments did not make sense to him, saying "I wouldn't do things like that. That's too much money. I don't have money to give up like that." When Hoffman was later asked about paying $15,880 to Cooper between January and June 1998, Hoffman testified that the figures "all surprise me, the sums involved." He reiterated that he has to be careful about what he spends. Hoffman acknowledged that he had helped Cooper with her dental *Page 42 
bill and loaned her $6,000 to purchase a car. (Cooper had paid back $3,500.)
 {¶ 214} Hoffman acknowledged that he had given $4,000 to Shannon Bramblett, an individual in the neighborhood. Hoffman explained that her husband was transferred to a new job and they were moving to Michigan, and Hoffman wanted to help her out until she resettled. Hoffman considered the payment to be a loan. (Cynthia later testified that this money was given as a gift.)
 {¶ 215} Hoffman acknowledged that he had given money to Phyllis Kuehnl, who he believed was a former neighbor. Hoffman did not recall that he had paid Dr. Kuehnl to provide psychological counseling to Cooper.
 {¶ 216} Based on his notes, Hoffman testified that he had $1,324,000 and annual income of $83,000. He testified that he had one checking and one savings account with Bank One, and he banked at the branch at Linden Avenue and Third Street.
 {¶ 217} When asked about Cynthia Scaccia, Hoffman stated that Cynthia was a neighbor that he had known for more than ten years. He gave her funds as gifts and reimbursed her when she spent money on his behalf. When asked about a series of checks written in April 1998, Hoffman stated that total payments of $16,000 did not sound accurate. He later explained that it did not seem correct because "[i]t's a pretty good size sum." However, when asked whether $68,300 given to Cynthia Scaccia between January and May 13, 1998 sounded accurate, Hoffman responded, "I think so, as far as I can tell." Hoffman described most of the payments as reimbursements, but he could not recall what was being reimbursed by individual checks.
 {¶ 218} Hoffman testified that he believed he was competent to handle his *Page 43 
financial affairs. He stated that he makes investments with his stockbroker and reads the Wall Street Journal and Dayton Daily News daily. Hoffman testified that, when he wrote the checks, he was aware what was happening, who the payee was, and the amount of the check. When asked whether he knew the amounts of the checks to Cynthia Scaccia when he gave her money, Hoffman responded, "I did when I gave them to her, or I wouldn't have done it." Hoffman denied that anyone assisted him with his financial affairs. He stated: "I have control over my financial affairs and expect to the rest of my life."
 {¶ 219} Hoffman was then asked about the activities Cynthia Scaccia does for him. Hoffman stated that she makes doctor appointments and takes him to the doctor. Hoffman stated that he relied on her for transportation, but "[t]he rest of the things [such as bathing] I'm capable of taking care." Hoffman testified that the Scaccias helped him get an alarm system for his house, and Cynthia sometimes helps him buy his clothing. Hoffman stated that he sees Cynthia several times per week but not daily.
 {¶ 220} Hoffman acknowledged that he had given gifts to Cynthia Scaccia in the amounts of $155,000 in 1996 and $143,000 in 1997. He explained the gifts, saying "I'm just trying to — we worked together on different things, and when she felt she had difficultly meeting her obligations, I helped her a bit." Hoffman recognized that he did not start giving large gifts until 1996, saying that he did not have the money to do it before then. The court asked Hoffman if he realized that Cynthia would have more than Hoffman if he gave her the same amount for another two years. Hoffman responded, "That probably would be true." When asked if that was what Hoffman *Page 44 
wanted, Hoffman responded, "Maybe. That's too early for me to say." At the end of his testimony, Hoffman testified that the money given to Cynthia Scaccia was "all on my own part" and "my initiative." Hoffman stated that the Scaccias have "become good friends of mine."
 {¶ 221} Reading Hoffman's testimony as a whole, Hoffman was reliant on his notes to recall the checks he had made. He had little memory of individual checks, was unable to identify the specific reasons for checks, and confused individuals' names. He was surprised at the large sums given to Cooper and, although he knew he had assets of $1.3 million, he repeatedly stated he couldn't afford to give large sums in a short period of time. Despite those statements, Hoffman acknowledged that he had given approximately $300,000 to Cynthia Scaccia in a two-year period. Although he could not explain why he had given specific sums, he was adamant that he had a good reason for doing so when he wrote the checks. Hoffman strongly believed that he was capable of controlling his finances. Hoffman also emphasized his independence and ability to care for himself, testifying that he mainly relied on the Scaccias to schedule doctor appointments and provide transportation.
 {¶ 222} The October 26 article emphasized Hoffman's inability to recognize checks and his confusion during his testimony. While he understood the amount of his assets, Hoffman's confusion and inability to recognize checks was apparent from the testimony. The article also reported that Hoffman understood that he had given approximately $300,000 to the Scaccias in 1996 and 1997. The article acknowledged Hoffman's subsequent statement that he was not compelled to give Cynthia Scaccia money and that, even if he could not later explain a check, "at the *Page 45 
time I wrote the check I had a very good reason to issue that." Although the Scaccias may have wished the newspaper to emphasize Hoffman's statements that he voluntarily gave the Scaccias hundreds of thousands of dollars and understood what he was doing, the article remains substantially true.
 {¶ 223} The trial court properly granted summary judgment regarding this article.
E. December 19, 1998 Opinion Article
 {¶ 224} Unlike the prior four news articles, the December 19 article was an opinion piece, reflecting mainly on the role of Adult Protective Services in protecting the elderly in the Dayton community.
 {¶ 225} "Long ago, the United States Supreme Court held that defamation requires the publication of a false fact, and opinions are constitutionally protected. Gertz v. Welch (1974), 418 U.S. 323. Justice Lewis Powell noted `there is no such thing as a false idea.' Id. at 339. In Milkovich v. Lorain Journal Co. (1990), 497 U.S. 1, 20, the Supreme Court held if the opinion implies a false and defamatory assertion of fact, the opinion is actionable. Ohio has recognized a similar protection for opinions under the Ohio Constitution. Scott v.News-Herald (1986), 25 Ohio St.3d 243[, 496 N.E.2d 699]. The determination of whether an averred defamatory statement constitutes opinion or fact is a question of law. Scott, supra, at 250." ScacciaI, supra.
 {¶ 226} When determining whether a statement is a constitutionally-protected opinion, courts apply a totality of the circumstances test. Wampler v. Higgins, 93 Ohio St.3d 111, 126,2001-Ohio-1293, 752 N.E.2d 962. In applying this test, courts consider several factors, including: (1) the specific language used; (2) *Page 46 
whether the statement is verifiable; (3) the general context of the statement; and (4) the broader context in which the statement appeared. Id., quoting Scott, 25 Ohio St.3d at 250. The weight to be given to any factor varies depending on the circumstances of the case, and the Supreme Court of Ohio has emphasized that the test should not be applied rigidly. Wampler, 93 Ohio St.3d at 126.
 {¶ 227} Hap Cawood's opinion article read, as follows:
 {¶ 228} "BE CAREFUL WHEN LIMITING ACCESS OF ADULT PROTECTIVE SERVICES IN SCACCIA GIFT CASE, JUDGE TAKES ON OVERSIGHT BURDEN
 {¶ 229} "In Scaccia gift case, judge takes on oversight burden
 {¶ 230} "It was hard to see my dad die when I was 22 and my mother die when I was 27. But if there was any compensation to be scraped out of that, it is that I was around to protect them — such as I could — until the end. Some people no longer have family to care for them in their difficult years, and their dependence can make them easy prey.
 {¶ 231} "Thank goodness, then, for agencies such as Montgomery County's Adult Protective Services. Overworked as they are, they help look after the welfare of those who have become vulnerable. If I and my siblings were to have passed before my parents, I would wish — require, if I could — that the APS folks be allowed to see them as often as possible.
 {¶ 232} "In a recent local case, Adult Protective Services played a most commendable role, though the agency was pretty much squeezed out in the end. It was APS that was contacted by Bank One (thank you very much for watching out for *Page 47 
your customers) when more than 150 checks from one of its customers, in amounts of $1,000 or more written to Cynthia Scaccia, had passed through the bank.
 {¶ 233} "As noted in the Daily News' Sept. 20 and Oct. 26 reports, the Montgomery County Prosecutor's Office was notified and raised questions about the elderly gentleman benefactor's competency in view of the fact that he had given Cynthia Scaccia and her husband, John, an attorney in Dayton's law department, more than a half-million dollars in gifts.
 {¶ 234} "On May 22, Montgomery County prosecutors, representatives of APS and the elderly man's probate attorney met and obtained the man's consent to visits by Adult Protective Services. By May 26, however, attorney James Ambrose was representing the man and Ambrose revoked the voluntary consent.
 {¶ 235} "After 2 ½ days of closed hearings, Montgomery County Probate Judge George Gounaris ordered that the Scaccias could receive no more than $10,000 a year in gifts from their neighbor, and that Cynthia could take no more than $75 a day for any services she provided.
 {¶ 236} "Gounaris determined that the man was not exploited but that his memory `has incapacitated his ability to administer his financial affairs' and so authorized Bank One to pay his expenses and voided the durable power of attorney the man had given to John Scaccia.
 {¶ 237} "To me, it looks like APS would be the ideal agency to oversee the gift-giving, given its reputation and the fact that APS has nothing to gain financially.
 {¶ 238} "Gounaris at first asked the county's Adult Protective Services to visit the man twice a month, but later restricted APS visits to one Wednesday *Page 48 
afternoon a month, with Cynthia Scaccia required to stay in the kitchen. Gounaris said the man had requested that limitation for the sake of privacy.
 {¶ 239} "Though I can see someone wanting his privacy, I have never heard of APS bullying anyone or being intrusive. That just isn't its way of operating.
 {¶ 240} "Since APS is limited to the margins in this instance, Gounaris carries a heavier burden to oversee the gift-giving in detail each year. In essence, the judge has offered to become the protective service. Given that APS wasn't given the pivotal role it could perform so well, that oversight is a serious obligation."
 {¶ 241} On appeal, the Scaccias do not specifically address Cawood's opinion article. Nevertheless, we note that the crux of the article is to express the opinion that APS is a commendable agency that plays a valuable role in providing oversight to the elderly, who may be vulnerable. Cawood expressed that APS played an important role in the investigation of Hoffman's case, and the agency should have been given a greater role in overseeing Hoffman once the probate court determined that oversight was necessary. Although Cawood reiterated the imprecise statement that the court had voided a power of attorney "given" to John Scaccia, that statement was substantially true, as discussed above. In all other respects, the factual statements by Cawood regarding the Hoffman case were objectively true. As summarized by the trial court, "[t]he December 19, 1998 column included accurate statements regarding the probate record and protected opinion. As such, the December 19, 1998 column does not contain actionable defamatory statements. It is clear from reading the December 19, 1998 column as a whole that the gist of the column is opinion, and all factual assertions were truthful." *Page 49 
 {¶ 242} Summary judgment was property granted.
 IV {¶ 243} Having overruled the assignments of error, the judgment of the trial court will be affirmed.
BROGAN, J. and GRADY, J., concur.
Copies mailed to:
John J. Scaccia Robert P. Bartlett, Jr. Jeffrey S. Sharkey Andrew J. Reitz Hon. Michael L. Tucker *Page 1